UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————

UNITED STATES OF AMERICA     :

          - v -           :          06 Cr. 266 (LMM)

WILLIAM CAPERS,       :

            Defendant.   :

———————————————————

# MEMORANDUM OF LAW
## IN SUPPORT OF WILLIAM CAPERS' PRE-TRIAL MOTION

MORVILLO, ABRAMOWITZ, GRAND,
IASON & SILBERBERG, P.C.
Cyrus R. Vance, Jr. (CV-2770)
Jerrold L. Steigman (JS-9137)
Kathryn M. Spota (KS-8688)
Attorneys for Defendant William Capers
565 Fifth Avenue
New York, NY 10017
(212) 856-9600

## <u>TABLE OF CONTENTS</u>

Preliminary Statement................................................................................................ 1

Statement of Facts ..................................................................................................... 2

Argument .................................................................................................................... 9

I.  *Miranda* Violations Require The Suppression Of All Statements Allegedly Made
    By Mr. Capers ...................................................................................................... 9

   A.  Standards Applicable To A Fifth Amendment *Miranda* Analysis ..................... 9

   B.  Statements Made In Response To Unwarned Custodial Interrogation Must Be
       Suppressed ...................................................................................................... 10

      1.  Unwarned Statements Made During The Supervisor's-Office Interrogation Must
          Be Suppressed ............................................................................................ 10

      2.  Unwarned Statements Made During The Van-Ride Interrogation Must Be
          Suppressed .................................................................................................. 11

      3.  Unwarned Statements Made At The First Bronx Domicile Interrogation Must Be
          Suppressed .................................................................................................. 12

   C.  Statements Made After *Miranda* Warnings Must Be Suppressed ..................... 13

      1.  Standards Applicable To Downstream *Miranda* Warnings............................ 14

      2.  The *Miranda* Warnings Ultimately Administered Were Ineffective In Safeguarding
          Mr. Capers' Fifth Amendment Rights .......................................................... 15

II.  Mr. Capers' *Miranda* Waiver Was Not Voluntary ............................................. 17

   A.  Standards Applicable To A Waiver Of Rights ................................................. 18

   B.  A Review Of The Totality Of The Circumstances Demonstrates That Mr. Capers
       Did Not Voluntarily Waive His Rights............................................................ 18

III.  The Physical Evidence Seized As A Result Of An Unwarned, Involuntary Statement
      Must Be Suppressed........................................................................................... 22

IV.  An Evidentiary Hearing Is Required.................................................................. 24

Conclusion ................................................................................................................ 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Berkemer v. McCarty*, 468 U.S. 420 (1984) ........................................................9

*Dickerson v. United States*, 530 U.S. 428 (2000) ............................................22

*Green v. Scully*, 850 F.2d 894 (2d Cir. 1988) .................................................18

*Hart v. Attorney General for Florida*, 323 F.3d 884 (11th Cir. 2003) ...............20

*Miranda v. Arizona*, 384 U.S. 436 (1966) .....................................................1, 9

*Missouri v. Seibert*, 542 U.S. 600 (2004) ...............................14, 15, 16, 17

*Moran v. Burbine*, 475 U.S. 412 (1986) ........................................................18

*Nelson v. Walker*, 121 F.3d 828 (2d Cir. 1997) ...........................................18

*New Jersey v. Portash*, 440 U.S. 450 (1979) ................................................23

*Oregon v. Elstad*, 470 U.S. at 298 (1985) ......................................................17

*Pennsylvania v. Muniz*, 496 U.S. 582 (1990) .................................................11

*Rhode Island v. Innis*, 446 U.S. 291 (1980) .............................................10, 12

*Simmons v. United States*, 390 U.S. 377 (1968) .............................................2

*Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998) .......................................9

*Thompson v. Keohane*, 516 U.S. 99 (1995) .....................................................9

*United States v. Ahmad*, 992 F. Supp. 682 (S.D.N.Y. 1998) ...........................24

*United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991) ..............................20, 21

*United States v. Cohen*, 372 F. Supp.2d 340 (E.D.N.Y. 2005)...................14, 17

*United States v. Culotta*, 413 F.2d 1343 (2d Cir. 1969) .................................24

*United States v. Jones*, 154 F. Supp.2d 617 (S.D.N.Y. 2001) .........................11

*United States v. McFarland*, 2006 WL 787785 (N.D.N.Y. Mar. 23, 2006).....................11

*United States v. Miller*, 382 F. Supp.2d 350 (N.D.N.Y. 2005).............................................2

*United States v. Morales*, 834 F.2d 35 (2d Cir. 1987) ......................................................12

*United States v. Newton*, 369 F.3d 659 (2d Cir. 2004) ......................................................11

*United States v. Patane*, 542 U.S. 630 (2004) ...................................................................23

*United States v. Reyes*, 249 F. Supp.2d 277 (S.D.N.Y. 2003), *rev'd on other grounds*, 353 F.3d 148 (2d Cir. 2003) .......................................................................11

*Yarborough v. Alvarado*, 541 U.S. 652 (2004)....................................................................9

## PRELIMINARY STATEMENT

Defendant William Capers has been indicted for an alleged theft of $160 in money orders from the Postal Service. He submits this memorandum of law in support of his motion to suppress statements and physical evidence obtained illegally after his arrest at the United States Postal Service's Bronx Detached Mail Unit on December 8, 2005. As will be demonstrated, Mr. Capers was interrogated on four occasions about his role in an alleged theft of the contents of two express mail envelopes. Mr. Capers was not provided *Miranda* warnings prior to the first three of these interrogations. The warnings that were administered later were ineffective. The unwarned interrogations violated Mr. Capers' rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the Fifth Amendment to the United States Constitution. Mr. Capers' unwarned statements, and the money orders seized as a result of the statements, must be suppressed.

While *Miranda* warnings were provided at the fourth interrogation, it was only after Mr. Capers had already made statements that led the inspectors to incriminating physical evidence. Moreover, Mr. Capers' putative waiver before the fourth interrogation was involuntary, and for this additional reason, statements thereafter made must be suppressed. In sum, all statements made by Mr. Capers pursuant to custodial interrogation must be suppressed.

As will be described more fully below, the circumstances surrounding Mr. Capers' first custodial interrogation were coercive. Thus, in addition to being extracted in violation of *Miranda*, statements made in response to that interrogation were involuntary. The physical evidence recovered from Mr. Capers as a result of such coercive custodial interrogation must therefore be suppressed.

## STATEMENT OF FACTS[1]

On December 8, 2005, William Capers, a Mail Handler assigned to the Bronx Detached Mail Unit ("DMU"), was working with another Mail Handler, Juan Lopez.[2]  Mr. Capers, born and raised in New York City, is 36 years old.  He is the father of a twelve year old daughter for whom he shares financial and parenting responsibility.  Mr. Capers had, until this incident, been employed by the Postal Service for eleven years.  (Capers Aff. ¶¶ 2-4.)

Mr. Capers and Mr. Lopez were arrested together following the execution of a sting operation by the United States Postal Inspection Service.  (Compl. ¶ 4.)  When Mr. Capers was arrested, he was in the process of loading a Postal Service trailer with Bulk Mail Containers ("BMCs").  (Compl. ¶ 7.)  Mr. Capers was exiting the trailer on a forklift when Postal Inspectors swarmed in to effect arrests.  (Capers Aff. ¶¶ 4-6.)  Inspector 1 ran up on him and in a loud voice directed him to exit the forklift on the platform behind the trailer.[3]  (Capers Aff. ¶ 4.)  Inspector 1 was armed with an automatic handgun and carried a high-watt flashlight over his shoulder,

---

[1]  Mr. Capers does not concede the truth of any of the government's allegations.  Rather, Mr. Capers preserves all of his Fifth Amendment rights and addresses the government's allegations only for the purpose of this motion.  Further, Mr. Capers submits an affidavit in support of this motion.  In so doing, he does not waive any rights under the Fifth Amendment.  *See Simmons v. United States*, 390 U.S. 377, 394 (1968); *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005).

[2]  *See* Affidavit of Defendant William Capers in Support of his Pre-Trial Motion to Suppress Statements and Evidence ("Capers Aff.") at ¶ 3, ¶ 4.  The Capers Aff. is attached as Exhibit A to the Declaration of Jerrold L. Steigman in Support of William Capers' Motions to Suppress Statements and Evidence ("Steigman Dec.").  *See also* Complaint against William Capers and Juan Lopez dated December 9, 2005 ("Compl.") at ¶ 7, attached to the Steigman Dec. as Exhibit C.

[3]  *See* United States Postal Service Surveillance Videotape, dated December 8, 2005, and designated by the Postal Service "Tape 137" ("Tape"), attached to the Steigman Dec. as Exhibit B, at 7:13pm.  This and all other citations to the Tape is as to its display of the approximate time the event occurred.

The defense knows the identity of only one of the inspectors involved in this arrest.  That inspector, Zajo Hoti, is referred to throughout this memorandum by name; the others are referred to as Inspectors 1, 3, and 4.

2

shining it onto Mr. Capers and into the face of Mr. Lopez, who exited the trailer on foot and with his hands raised.  (Tape 7:13-14.)

Altogether, four Postal Inspectors were involved in the arrests.  (Tape 7:12-16.) Inspector 1, pointing with the flashlight and his extended arm, directed Mr. Capers to exit the forklift.  (Tape 7:14; Capers Aff. ¶ 4.)  Mr. Capers complied with Inspector 1's command, just as Inspector Zajo Hoti raced up the stairs next to the trailer and onto the platform.  (Tape 7:14.) Inspector Hoti's automatic handgun was visible in a holster on his hip.  (Tape 7:16.)

Inspector 1 grabbed a fistful of Mr. Lopez's jacket at the shoulder and took Mr. Lopez around the side of the trailer.  There Inspectors 1 and Hoti immediately handcuffed Mr. Lopez behind his back.  (Tape 7:14.)

The inspectors snapped commands at both Mr. Capers and Mr. Lopez and moved the arrestees around.  The commands included "be still," "turn around," "stay still" and "come over here."  (Capers Aff. ¶6.)  Inspector Hoti told Inspector 1 to "keep them separate" and "don't let them talk," referring to Mr. Capers and Mr. Lopez.  (Capers Aff. ¶ 6; Tape 7:14.)

Immediately after Mr. Capers exited the forklift, Inspector 4 directed Mr. Capers to face a nearby BMC and handcuffed him behind his back using metal handcuffs.  Mr. Capers, guarded by Inspector 4, was then turned around so that he could see Inspector Hoti escorting Mr. Lopez in handcuffs to an area adjacent to some BMCs.  There, Inspector Hoti engaged Mr. Lopez in a short exchange, and then Inspector Hoti paraded Mr. Lopez past Mr. Capers and away.  (Tape 7:14-15.)

Inspector 4 guarded Mr. Capers while Inspector Hoti entered the trailer.  While Inspector Hoti was in the trailer, Inspector 4 patted down Mr. Capers around the chest and picked through

3

Mr. Capers' jacket pocket, one of his pants pockets, and the front pocket of Mr. Capers' sweatshirt. (Tape 7:15.)

Inspector Hoti thereafter emerged from the trailer with two express mail envelopes. He spoke momentarily with someone on the DMU floor and then brought the envelopes over to Mr. Capers. Standing directly in front of Mr. Capers, with Inspector 4 still standing guard, Inspector Hoti (with his free hand) patted down Mr. Capers for a second time, this time removing Mr. Capers' knit winter cap from his head and handing it to one of the other inspectors. (Tape 7:16-17.)

This process, from the initial arrest, took about three or four minutes. Inspector Hoti, with Inspectors 3 and 4, then escorted Mr. Capers to the DMU floor supervisor's office. (Tape 7:17.) Inspectors 3 and 4 were also armed.

### Un-Mirandized Interrogation No. 1: The Supervisor's-Office Interrogation

After Inspectors Hoti, 3 and 4 took Mr. Capers into the supervisor's office; Inspector Hoti immediately exited the office, closing the door behind him. The supervisor's office is small and contained chairs, two desks, and a window facing into the dispatcher's office next door. The supervisor's office is fully enclosed with a solid door and a ceiling lower than the DMU's ceiling. (Capers Aff. ¶ 7.)

The inspectors seated Mr. Capers, still handcuffed behind his back, in a chair facing the door. The handcuffs were tight and constricting. Inspector 3 stood near and guarded the door. Shortly thereafter, Inspector Hoti reentered the office. Inspector Hoti strode in and positioned himself so that he was "standing over" Mr. Capers. Inspector 3 covered Inspector Hoti's flank by approaching from her post at the door and taking up a new position, slightly behind and to the side of Inspector 2. Inspector Hoti's sweater was pulled down over his gun, but the gun's bulk

was visible.  Mr. Capers could see that Inspector Hoti was armed; Mr. Capers was seated and the weapon was at eye-level.[4]  (Capers Aff. ¶ 8-10.)

  With the principals arranged as above, the inspectors initiated the interrogation.  They did not administer *Miranda* warnings before beginning the questioning.  Inspector Hoti asked Mr. Capers: "You know why we're here?"  Mr. Capers did not respond.  Inspector Hoti then asked "Where are the money orders?"  Mr. Capers replied by nodding toward the "cargo" pocket of his pants.  (Capers Aff. ¶¶ 11-15; Compl. ¶ 10.)

  Inspector Hoti, relying on Mr. Capers' response to his question, probed Mr. Capers' pocket and seized two $80 money orders.  (Capers Aff. ¶ 16.)  Inspector Hoti then asked: "What are you supposed to do with express mail envelopes?", to which Mr. Capers responded:  "You're supposed to give them to the supervisor."  (Capers Aff. ¶ 17.)  Inspector Hoti reviewed the money orders and told Mr.Capers that the serial numbers on the money orders matched the ones the inspector had purchased.  (Capers Aff. ¶ 18.)

  After this exchange and after recovering the two money orders from Mr. Capers' person, Inspector Hoti exited the room.  The episode in the supervisor's office lasted approximately five minutes.   Mr. Capers was consistently reminded that Inspector Hoti carried a weapon during the interrogation; Mr. Capers was seated.  Mr. Capers was never provided *Miranda* warnings at any point during this exchange.  (Capers Aff. ¶ 19.)

Un-Mirandized Interrogation No. 2: The Van-Ride Interrogation

  At the conclusion of the first interrogation, the inspectors took Mr. Capers to a waiting Postal Inspection Service van.  (Compl. ¶ 12.)  The inspectors placed Mr. Capers in the back of the van; his hands remained cuffed behind his back.  The inspectors left the van's sliding door

---

[4] Inspector 3's long coat obscured the view of her firearm.  (Tape 7:12-17.)

5

open.  Mr. Capers was in the van for ten to fifteen minutes before Inspector 4 entered the van, sat

next to Mr. Capers, and the van departed.  Inspector 3 drove.  (Capers Aff. ¶¶ 19-24.)

As the van began making its way to a Postal Inspection Service facility, the Bronx

Domicile, Inspector 4 continued questioning Mr. Capers.  Inspector 4 did not administer

*Miranda* warnings to Mr. Capers before undertaking the interrogation.  The inspector asked

questions relating to Mr. Capers' car, a 1993 Mercedes-Benz, which Mr. Capers occasionally

drove to work.  Inspector 4 knew that the vehicle was registered in the name of an ex-girlfriend

of Mr. Capers.  Inspector 4 asked where the car was.  He said "the car is nice, where is it?" and

"what year is it?"  Mr. Capers' response to these inquiries was "home."  (Capers Aff. ¶¶ 25-30.)

Inspector 4 continued to ask about the vehicle—"When did you buy it?" "From a

dealer?" "Did you buy it new?" "What class is it?" "Who did the work?" "Have you taken it on a

trip?"  Inspector 4 remarked to Inspector 3 that while he (Inspector 4) has a good salary, he

cannot afford a Mercedes and wondered out loud how Mr. Capers could afford the car.  Inspector

3's reply was that she had never even been in a Mercedes, much less owned one.  (Capers Aff. ¶¶

29-32.)  The van ride to the Bronx Domicile lasted twenty minutes.  (Capers Aff. ¶ 33.)

<u>Un-Mirandized Interrogation No. 3: The First Bronx Domicile Interrogation</u>

The inspectors took Mr. Capers from the van into the Bronx Domicile.  Still in handcuffs,

Mr. Capers was taken to an office with a table and a few chairs.  The inspectors seated him in a

chair with the handcuffs still behind his back.  Inspector 4 asked Mr. Capers a series of

questions, including asking Mr. Capers whether he had any children.  *Miranda* warnings were

not provided prior to the questioning.  (Compl. ¶ 12; Capers Aff. ¶¶ 34-40.)

Interrogation No. 4 with *Miranda*: The Second Bronx Domicile Interrogation

After Mr. Capers had been handcuffed behind his back for thirty to forty-five minutes,

Inspector Hoti entered the room.  He asked whether Mr. Capers had been frisked.  The inspectors

then stood Mr. Capers up, patted him down, removed the contents of his pockets, and placed the

contents on the table.  One handcuff was then detached from Mr. Capers' wrist, and he was re-

seated and handcuffed to the chair.  (Capers Aff. ¶¶ 41-44.)

Inspector Hoti presented a *Miranda* waiver form to Mr. Capers and asked him to sign.[5]

(Compl. ¶ 12.)  Mr. Capers read the *Miranda* form.  He did not want to sign it, and asked what

would happen if he did not.  Inspector Hoti told Mr. Capers, in substance, that if he did not sign

the form, it would look to the judge as if Mr. Capers was not cooperating; but if he did sign the

form, the judge may be more lenient with Mr. Capers.  Based upon Inspector Hoti's explanation,

Mr. Capers signed the *Miranda* waiver form.  (Capers Aff. ¶¶ 45-50.)

Inspector Hoti then repeated his earlier questions regarding what Mr. Capers did with the

express mail envelopes and what his responsibilities were with respect to those envelopes.

(Capers Aff. ¶ 51.)  Mr. Capers again replied that when mail handlers are working in the evening

and are confronted with express mail envelopes, the mail handlers must give the express mail to

their supervisors.  (Capers Aff. ¶¶ 51-52.)  According to the complaint, Mr. Capers at this point

said that he had opened one of the express mail envelopes and put the money orders in his

pocket.  (Compl. ¶ 12.)  According to the inspector's notes of the interview, Mr. Capers

responded to questions regarding what he had done with the money orders by stating that he

"[t]old Juan Lopez [that there] were two express mail pieces," "ripped open the express Mail

---

[5] *See Miranda* waiver form, attached to the Steigman Dec. as Exhibit D.

Envelope," "[d]id not look [at] the [money orders] he put into his pocket," and "[t]hrew [the] Exp[ress] Mail envelope back into the BMC."[6]

Inspector Hoti then continued Inspector 4's previous line of questioning regarding Mr. Capers' vehicle.  Mr. Capers was confused about both inspectors' interest in the car and inquired into that interest.  Inspector Hoti told Mr. Capers that the inspectors wanted to know about the car so that in the course of their surveillance they could identify Mr. Capers.  Inspector Hoti inquired into Mr. Capers' reasons for a recent trip to New Jersey.  Presumably on account of the several errands on which the inspectors had followed Mr. Capers one day, Inspector Hoti described Mr. Capers as a "busy man."  (Capers Aff. ¶¶ 53-57.)

At one point in the interrogation, Mr. Capers hesitated in answering Inspector Hoti's questions regarding the mail theft.  When he did so, Inspector Hoti asked Mr. Capers "who are you trying to protect? Lopez?  He doesn't give a fuck about you."  Mr. Capers thereafter refused to say anything at all.  Inspector Hoti then banged the palms of both hands on the table and ended the interview.  (Capers Aff. ¶¶ 58-60.)

Mr. Capers, still in handcuffs, was then taken to another room.  Mr. Lopez was in this room with the other two inspectors.  Mr. Capers was seated and again handcuffed to a chair. (Capers Aff. ¶¶ 61-63.)  Inspector 3 made a comment to the other inspectors that it was "cold down there."  Inspector Hoti replied that he "thought Capers would crack."  (Capers Aff. ¶¶ 64-66.)  The inspectors thereafter processed Mr. Capers into federal custody.

---

[6] *See* Hoti Interview Notes, dated December 8, 2005, attached to the Steigman Dec. as Exhibit E.

## ARGUMENT

### I.    *MIRANDA* VIOLATIONS REQUIRE THE SUPPRESSION OF ALL STATEMENTS ALLEGEDLY MADE BY MR. CAPERS

The statements Mr. Capers made while in the supervisor's office at the DMU ("the supervisor's-office interrogation"), while being transported to the Bronx Domicile ("the van-ride interrogation"), and initially while in the interview room at the Bronx Domicile ("the first Bronx Domicile interrogation"), were in direct response to questioning by postal inspectors while he was in custody.  The inspectors failed completely to administer *Miranda* warnings before engaging in these three custodial interrogations and therefore any statements made must be suppressed.  While the inspectors finally gave Mr. Capers *Miranda* warnings before his second interrogation at the Bronx Domicile ("the second Bronx Domicile interrogation"), the "downstream" warnings were, as a matter of law, ineffective to communicate to Mr. Capers his Fifth Amendment rights.  Therefore, the statements he made after being warned must also be suppressed.

#### A.    Standards Applicable to a Fifth Amendment *Miranda* Analysis

It is well established that law enforcement, including postal inspectors, must provide a defendant with *Miranda* warnings if he is in custody and subject to interrogation.  *Miranda v. Arizona,* 384 U.S. at 444; *Thompson v. Keohane*, 516 U.S. 99, 102 (1995).  The custody element is met if the circumstances of the interrogation indicate that a reasonable person would have felt that he was "not at liberty to terminate the interrogation and leave," *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004), and ultimately whether the suspect was "subjected to restraints comparable to those associated with a formal arrest." *Id.*; *see also Berkemer v. McCarty,* 468 U.S. 420, 441 (1984).  Factors to consider in a custody inquiry include the location and atmosphere of the

interrogation and whether the suspect is searched, frisked, or patted down. *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (internal citations omitted).

The interrogation element is met if law enforcement engages in "express questioning or its functional equivalent," including "any words or actions . . . (other than those normally attendant to arrest and custody) that [law enforcement] should know are reasonably likely to elicit an incriminating response from the suspect . . . ." *Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980).

**B.    Statements Made in Response to Unwarned Custodial Interrogation Must be Suppressed**

**1.    Unwarned Statements Made During the Supervisor's-Office Interrogation Must be Suppressed**

Statements Mr. Capers made while being questioned in the supervisor's office must be suppressed because he was subjected to custodial interrogation, and the inspectors did not first administer *Miranda* warnings to him.  After the inspectors confronted Mr. Capers and Mr. Lopez outside the trailer, they placed Mr. Capers under arrest by handcuffing him behind his back. Three inspectors then led Mr. Capers to a small office and closed the door.  Still handcuffed, Mr. Capers was seated in a chair while Inspector Hoti "stood over him" and interrogated him. (Capers Aff. ¶ 9.)  Inspector 3 stood guard at Inspector Hoti's side.  Mr. Capers could see that Inspector Hoti was armed.  Inspector Hoti asked about the location of the allegedly missing money orders and, in direct response, Mr. Capers nodded towards his pocket.  According to Inspector Hoti, Mr. Capers stated that he had money orders in his pocket that were not his and that he got the money orders from "the Express Mail."  (Compl. ¶ 10.)  Also in response to direct questioning, Mr. Capers stated that mail handlers are supposed to give express mail to the supervisor.

The exchange in the supervisor's office constituted custodial interrogation. The circumstances of Mr. Capers' interrogation—handcuffed and alone in an interview room with individuals he knew to be law enforcement officers—presents a "classic custodial setting with inherently coercive pressures." *United States v. McFarland*, 2006 WL 787785, at *17 (N.D.N.Y. Mar. 23, 2006). A reasonable person cannot feel free to end an interrogation and leave when he has been handcuffed and removed to an enclosed office and is being questioned about an alleged illegal act by members of law enforcement who are looming over him. *See United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest."). It is equally certain that Inspector Hoti's questions constituted an interrogation of Mr. Capers. The inspector "express[ly] questioned" him about the alleged criminal act at issue, a technique surely designed to elicit an incriminating response. *See United States v. Reyes*, 249 F. Supp. 2d 277, 279-80 & n.2 (S.D.N.Y. 2003), *rev'd on other grounds*, 353 F.3d 148 (2d Cir. 2003).

That this unwarned custodial interrogation was a violation of *Miranda* should be beyond debate. As a result, all of Mr. Capers' statements, both verbal and nonverbal, *see Pennsylvania v. Muniz*, 496 U.S. 582, 594 n.9 (1990); *United States v. Jones*, 154 F. Supp. 2d 617, 623 n.6 (S.D.N.Y. 2001), must be suppressed.

### 2.    Unwarned Statements Made During the Van-Ride Interrogation Must Be Suppressed

As with the statements made in response to the supervisor's-office interrogation, statements made by Mr. Capers while he was being transported to the Bronx Domicile must also be suppressed for lack of *Miranda* warnings. The inspectors removed Mr. Capers from the supervisor's office and, still handcuffed, placed him in the back of a van. Inspector 4 thereafter questioned Mr. Capers about his car for the duration of the trip to the Bronx Domicile.

Specifically, the inspector asked Mr. Capers about the car's cost, the manner in which he purchased the car, and questioned how Mr. Capers could have afforded the car. Mr. Capers told the inspector that the car was located at his home.

It is inarguable that Mr. Capers remained in custody during his transport. He was handcuffed in a law enforcement vehicle and accompanied by armed postal inspectors while being transported to a postal inspection facility for questioning concerning an alleged criminal act. *See Rhode Island v. Innis*, 446 U.S. at 298. Inspector 4's questioning about Mr. Capers' inability to purchase the car also meets the interrogation element. The questions and remarks concerning the cost of a luxury car (albeit one that was then twelve years old) could only have been designed to elicit incriminating statements from Mr. Capers concerning alternate sources of income for the car; namely—mail theft. These questions reflected the inspector's "aware[ness] of the potentially incriminatory nature of the disclosures sought," *United States v. Morales,* 834 F.2d 35, 38 (2d Cir.1987), because the questions were related to the alleged criminal act at issue. In the absence of *Miranda* warnings, therefore, all of Mr. Capers' statements in the van also must be suppressed.

### 3.    Unwarned Statements Made During the First Bronx Domicile Interrogation Must be Suppressed

Statements made in response to the first Bronx Domicile interrogation also must be suppressed. Having twice subjected him to custodial interrogation, the inspectors brought Mr. Capers, still handcuffed, to the Bronx Domicile. The inspectors took Mr. Capers into a small office and sat him in a chair, with his hands still cuffed behind his back. Mr. Capers remained in custody throughout this period. The inspectors' questioning of Mr. Capers in this office— focused on his family and personal life—was no doubt designed to instill guilt in Mr. Capers,

12

and thereby induce him to "confess." As he did not receive *Miranda* warnings prior to this third interview, any statements he made must be suppressed.

### C.        Statements Made after *Miranda* Warnings Must be Suppressed

Statements Mr. Capers made in response to interrogation at the Bronx Domicile after he signed the *Miranda* waiver form must also be suppressed. This fourth interrogation was merely a continuation of the previous three rounds of questioning, and under the circumstances the *Miranda* warnings were ineffective.

After Mr. Capers had been in the interview room, faced with questions and handcuffed behind his back for approximately thirty to forty-five minutes, Inspector Hoti entered the room. Mr. Capers was stood up and patted down, and his possessions were taken from him. Inspector Hoti presented Mr. Capers with a *Miranda* waiver form. Mr. Capers did not want to sign the form and asked what the outcome of not signing would be. Inspector Hoti told Mr. Capers that if he waived his Fifth Amendment rights, the judge would be more lenient with him, but if he did not, he would be seen as uncooperative. Mr. Capers, with hesitation, signed the waiver.[7] Inspector Hoti then repeated the questions from the supervisor's-office interrogation, asking what mail handlers are supposed to with express mail envelopes.[8] Mr. Capers again responded that mail handlers are supposed to give express mail envelopes to their supervisors. According to the inspector, Mr. Capers said that he had opened an envelope and pocketed the money orders within. Inspector Hoti continued Inspector 4's interrogation by questioning Mr. Capers about his

---

[7] This memorandum argues in Part II that Mr. Capers did not voluntarily waive his rights.

[8] We are unaware that the government made any effort to tape record or videotape any of its interrogations attendant to this arrest. If in fact none exist, it is unclear why, after three interrogations and the passage of time, the inspectors did not seek to tape record this last interrogation to prove that the statements they attribute to Mr. Capers were, in fact, made.

car, and, in response to Mr. Capers' question regarding the inspectors' interest in the car, stated that he needed to learn more about the car in order to track Mr. Capers' whereabouts.

### 1.      Standards Applicable to Downstream *Miranda* Warnings

An interrogation technique involving sequential unwarned and warned interrogations presents a unique *Miranda* challenge. *Missouri v. Seibert*, 542 U.S. 600, 609 (2004).  When law enforcement officials provide a defendant with belated *Miranda* warnings after having already subjected that defendant to custodial interrogation, the threshold question concerning the admissibility of the post-warning statements is "whether in the circumstances the *Miranda* warnings given could reasonably be found effective." *Id.* at 612 & n.4.  That is, could a defendant truly comprehend his right to be silent or ask for the representation of counsel after he has already been questioned without the benefit of a reminder of those rights and thus provided incriminating statements?  The answer to the question of whether a downstream *Miranda* warning was effective requires the consideration of certain factors, including:

> The completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 542 U.S. at 612, 615.  The last factor—continuous treatment of the separate interrogations—"includes consideration of whether the warnings that were administered included a warning that the statement previously made is inadmissible." *United States v. Cohen*, 372 F. Supp. 2d 340, 355 (E.D.N.Y. 2005).  As a plurality of the Supreme Court recently held in *Missouri v. Seibert*, 542 U.S. at 604, 611, the use of a "question-first" interrogation technique whereby law enforcement subjects a suspect to unwarned custodial interrogation until securing a confession and then, after administering *Miranda* warnings, again seeks to elicit the same

incriminating statements, violates the suspect's Fifth Amendment rights because "the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning." *Id.* at 612 n.4.

### 2.   The *Miranda* Warnings Ultimately Administered Were Ineffective in Safeguarding Mr. Capers' Fifth Amendment Rights

The postal inspectors here utilized a question-first technique during their four-stage interrogation of Mr. Capers. The unwarned and warned statements were in response to the same questions put to Mr. Capers. The inspectors conducted a sequential interrogation like the one condemned in *Seibert* when they questioned Mr. Capers until he confessed, and then later, having provided *Miranda* warnings, asked all the same questions again. The interrogations focused on the alleged criminal act at issue—taking money orders from the mail—and resulted in Mr. Capers allegedly confessing to the commission of that very act. Inspector Hoti's questions during the supervisor's-office interrogation and the second Bronx Domicile interrogation overlapped entirely, with each set focusing on what Mr. Capers allegedly did (pocket the money orders) compared to what he should have done (turn the money orders over to the supervisor). Indeed, after Inspector Hoti concluded his initial questioning, there was "little, if anything, of incriminating potential left unsaid." *Seibert*, 542 U.S. at 616. Similarly, the content of the van-ride interrogation and the second Bronx Domicile interrogation substantially overlapped as well. Inspector 4 questioned Mr. Capers about his car while they were in transit in the van, and Inspector Hoti stepped in to interrogate Mr. Capers about his car, and other topics, at the subsequent interview at the Bronx Domicile.

As for the timing and setting of the interrogations, they occurred one after another. At no time was Mr. Capers provided with a break from questioning; instead, the four successive interrogations merged from one to the other without any clear breaks. In fact, the only point at

which Mr. Capers was relieved from the persistent and aggressive questioning by the postal inspectors occurred at the end of the second Bronx Domicile interrogation, when Inspector Hoti acknowledged that Mr. Capers had invoked his right to silence; only then did the interrogations conclude. Additionally, the Bronx Domicile interrogations occurred in the very same building; indeed, in the very same room.

The next *Seibert* factor, the continuity of police personnel, dramatically points to the conclusion that the four rounds of questioning were in fact part of a single, continuous interrogation. At least one inspector at each of the four interrogations also was present at another of the interrogations. Inspector 3 took part in the first, second and third interrogations; Inspector 4 took part in the second, third and fourth interrogations; Inspector Hoti bookended the process with his presence at the crucial first and last interrogations. Inspector Hoti's presence at the supervisor's-office interrogation and the second Bronx Domicile interrogation was especially important because Inspector Hoti asked Mr. Capers the questions that led to his incriminating statements both before the *Miranda* warnings and afterwards. Each of the inspectors knew of the incriminating statements made at their earlier, unwarned interrogations, and, therefore, acted in a capacity of "policing" the subsequent interrogations for inconsistencies between Mr. Capers' earlier and later statements to the exact same questions. The continuity of the police personnel is a strong indication that this was a continuing interrogation.

Lastly, and crucially, the downstream[9] *Miranda* warnings Mr. Capers eventually received did not inform him that his previous statements were inadmissible—and no inspector ever said anything to this effect. As the plurality and concurrence of *Seibert* agreed, an addendum

---

[9] While the *Seibert* Court used the term "midstream" to denote the point at which *Miranda* warnings were provided in that case, the variation "downstream" is more apt to the interrogations of Mr. Capers since he was not provided warnings until the very end.

warning which makes this critical disclosure can go a long way to reducing the confusion that attend midstream recital of the warnings. *See Seibert*, 542 U.S. at 616 n.7 (plurality opinion); *id.* at 622 (Kennedy, J., concurring). Without a warning that prior statements were inadmissible, "there was no way for [Mr. Capers] to overcome the 'probable misimpression' that having once answered the questioning of [the postal inspectors,] there was no use to then refuse to speak." *Cohen*, 372 F. Supp. 2d at 340 (quoting *Seibert*, 542 U.S. at 616). The inspectors' "question-first" approach undermined the efficacy of the *Miranda* warnings finally provided. The warnings therefore did nothing to apprise Mr. Capers of his Fifth Amendment rights. *See Seibert*, 542 U.S. at 616 n.7 ("[The absence of an addendum warning] is clearly a factor that blunts the efficacy of the warnings and points to a continuing, not a new, interrogation.") Mr. Capers' confession at the second Bronx Domicile interrogation must be suppressed.[10]

## II.   MR. CAPERS' *MIRANDA* WAIVER WAS NOT VOLUNTARY

Mr. Capers' statements after he was provided warnings and signed the waiver form must also be suppressed because his waiver was involuntary. The warnings Mr. Capers received were accompanied by a measure of coerciveness and trickery that prevented Mr. Capers from making the free choice to forego his Fifth Amendment rights.

---

[10] This is not a situation involving a good-faith *Miranda* mistake. *See Seibert*, 542 U.S. at 615 (distinguishing *Oregon v. Elstad*, 470 U.S. 298, 309 (1985), on this basis). Good faith mistakes may sometimes occur, if, for example, officers have not specifically targeted a suspect at the time questioning begins. That it was quite clear to the inspectors that Mr. Lopez and Mr. Capers were suspects in this crime was evidenced by the immediate apprehension and handcuffing of the two. *Miranda* warnings were plainly required at that time, prior to any questioning.

The government has no recourse to an argument that the absence of warnings to Mr. Capers before he was interrogated was a good-faith *Miranda* mistake, as in where an officer was killing time waiting for his partner to finish a discussion with a defendant's mother, *see Oregon v. Elstad*, 470 U.S. 298, 301-02 (1985), or in a "he-said, she-said" situation where the officers wanted to get the defendant's side of the story, *see Cohen*, 372 F. Supp.2d at 358. Mr. Capers' arrest, after all, was the result of a sting operation in which the bait was allegedly taken.

A.      **Standards Applicable to a Waiver of Rights**

The government has the burden of proving the voluntariness of a suspect's waiver of

*Miranda* rights by a preponderance of the evidence.  *Missouri v. Seibert*, 542 U.S. at 610 n.1.

The government must prove that a suspect's decision to relinquish *Miranda* rights was voluntary,

knowing, and intelligent.  Relinquishment:

> must have been voluntary in the sense that it was the product of a free and
> deliberate choice rather than intimidation, coercion or deception.  [The waiver]
> must have been made with full awareness of both the nature of the right
> abandoned and the consequences of the decision to abandon it.  Only if the
> totality of the circumstances surrounding the interrogation reveal both an
> uncoerced choice and the requisite level of comprehension may a court properly
> conclude that *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations and internal quotations omitted).  The

factors considered in an inquiry into the voluntariness of a waiver include the characteristics of

the accused, such as his experience, background, age and intelligence; the conditions of

interrogation; and police attitude and conduct, such as physical abuse, handcuff restraint, and

psychologically coercive tactics.  *See Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997); *Green

v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988).

B.      **A Review of the Totality of the Circumstances Demonstrates
        that Mr. Capers did not Voluntarily Waive his Rights**

By the time Mr. Capers received *Miranda* warnings he had been handcuffed behind his

back for two hours.  A suspect has a very difficult time taking any volitional acts when

compromised in this way.  This is especially so for one who has been subject to near continuous

interrogation without the benefit of *Miranda* over the course of hours, and never for a moment

out of the control of a core team of armed inspectors.

The inspectors used coercive tactics from the very beginning of his custody: parading a

co-defendant past him, approaching him with recovered, damning evidence and subsequently

interrogating him.  They stood over him, armed, and demanded answers from him.  Ultimately, they succeeded, and thereby extracted a confession from him.

The coercive tactics did not end with Mr. Capers' initial confession.  While in transit, the inspectors introduced a line of questioning regarding Mr. Capers' car.  While at first blush the van-ride interrogation about the car appeared to be unconnected to the alleged mail theft and, at the very least, confusing, the inspector's implication in this line of questioning, of course, was that Mr. Capers did not have the financial resources to legitimately buy the car.

Similarly, the discussion leading up to the signing of the waiver was directly aimed at undermining Mr. Capers' will.  Even a facially friendly inquiry into whether Mr. Capers "had kids"—when viewed in the light of Mr. Capers' initial confession and the inspectors' "just-thinking-out-loud" routine in the van as to how Mr. Capers could afford a Mercedes—becomes further taunting under the circumstances.  "Do you have kids?"; i.e., "Who have you let down on account of this act?" or "Who else will suffer as a result of this theft (we know) you committed?"  These questions were part of an overall effort to undermine Mr. Capers' ability to make decisions in his own interest.

And when it came time to sign the waiver, the government employed coercive tactics.  Inspector Hoti told Mr. Capers that if he waived his Fifth Amendment rights he may obtain leniency from the court, and if he did not, he would be viewed as uncooperative and this would be detrimental to him in the outcome of the case.  This is an age-old tactic aimed at enticing suspects to confess.  Perhaps alone, police remarks regarding a sentencing court's leniency for cooperators and harshness for those who exercise their rights do not rise to the level of constitutional violations.  They take on, however, a more serious significance given the point in the interrogations at which they were made—after Mr. Capers was subjected to handcuffed,

19

custodial interrogations, after he had made incriminating statements, and after the inspectors had recovered physical evidence from his person and elsewhere.

Mr. Capers' question regarding the impact of signing the form demonstrates that he was confused about its purpose and effect. This confusion as to the nature of his rights and the consequences of abandoning them makes a voluntary waiver almost impossible. Inspector Hoti's "explanation" of the effect of Mr. Capers' waiver did nothing to raise Mr. Capers' awareness of his Fifth Amendment rights. Rather, Inspector Hoti's reply was an attempt to trick Mr. Capers into waiving his *Miranda* rights.

"[A]ffirmative misrepresentations by the police" are coercive, *see United States v. Anderson,* 929 F.2d 96, 100 (2d Cir. 1991), as are "deceptive stratagems such as giving false legal advice." *Id*. at 101. Inspector Hoti's explanation was just such a deceptive strategy.

The truth is, signing the form would likely have no bearing on leniency, and not signing it would not make it appear as if Mr. Capers was not "cooperating." Signing the form does, however, affect the case; a valid waiver of rights permits the government to admit statements thereafter made. Inspector Hoti misrepresented the purpose and effect of signing the form and thereby rendered false legal advice in contravention of *Anderson.*

Inspector Hoti's interview-room lawyering is similar to that rejected in the Eleventh Circuit in *Hart v. Attorney General for Florida.* The *Hart* court found that "[t]he phrase 'honesty will not hurt you' is simply not compatible with the phrase 'anything you say can be used against you in court.'" *Hart v. Attorney General for Florida*, 323 F.3d 884, 894 (11th Cir. 2003). Inspector Hoti said virtually the same thing in telling Mr. Capers that signing the form would have a positive impact on the outcome of the case. The assertion that Mr. Capers' signing the form (and thereafter speaking with the inspectors) would have a positive impact on the case

is likewise incompatible with the warning that anything Mr. Capers said could be used against him. Under *Anderson* and *Hart*, this is false legal advice and "pose[s] a serious constitutional problem." *Anderson*, 929 F.2d at 100.

That Mr. Capers was conflicted in his signing of the waiver form is further demonstrated by how the questioning proceeded thereafter. Mr. Capers, after answering the same questions posed earlier regarding the express mail envelopes, at one point hesitated in providing a response. In doing so, he clearly agitated the inspectors. Inspector Hoti's frustration was unconcealed; he attacked Mr. Capers' hesitation with an inquiry into who Mr. Capers could be trying to protect. Inspector Hoti implied that Mr. Lopez, in the course of his interrogations, had made disclosures detrimental to Mr. Capers. This exchange also demonstrates the hostile tone of the interrogation; indeed, Inspector Hoti ended it by banging his hands on the table in frustration that he could coax no further statements from his prisoner.

This analysis is further bolstered by other remarks Inspector Hoti made during the second Bronx Domicile interrogation and thereafter. The inspectors disclosed that they had been following Mr. Capers, a tactic surely designed to convey the control and power the inspectors had over him. Inspector Hoti mockingly called Mr. Capers a "busy man"; an obvious (and wholly unsupported) accusation that Mr. Capers was involved in broad-scale illicit activity. And in response to Inspector 3's comment regarding how cold the interview room was, Inspector Hoti replied that he thought Mr. Capers was going to "crack." This is unsubtle proof of the inspector's purpose in the lengthy interrogation process.

In sum, this lengthy interrogation process, throughout which Mr. Capers remained handcuffed, and the coercive police conduct before and surrounding the putative waiver of *Miranda*, including the rendering of false legal advice, demonstrates the involuntary nature of his

waiver. Mr. Capers' honest inquiry into what would happen if he did not sign the form—a plea for an explanation to the expertise of the law enforcement officers interrogating him—does not permit a finding that he understood the ramifications of giving up his rights and speaking. That he did not want to continue speaking soon after he began shows that Mr. Capers did not know what signing the form meant. And last, the comments of the inspectors throughout the interrogations demonstrate the hostility Mr. Capers faced, an atmosphere far from conducive to voluntary decision-making. For all these reasons, the *Miranda* waiver was invalid, and the post-warning statements must be suppressed.

## III.   THE PHYSICAL EVIDENCE SEIZED AS A RESULT OF AN UNWARNED, INVOLUNTARY STATEMENT MUST BE SUPPRESSED

Not only Mr. Capers' statements, but the fruits of the illegal questioning—the $160 in money orders—must be suppressed. Because the interrogation of Mr. Capers in the supervisor's office rendered his statements involuntary, due process requires the fruits of the statements be suppressed.

Suspects have a due process right under the Fifth Amendment not to have statements or the fruits of those statements coerced from them. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000). Whether an interrogation resulted in an involuntary statement requires an inquiry into whether a defendant's will was overborne by the circumstances surrounding the giving of the confession. *Id.* at 434.

Mr. Capers' will was overborne, and he was coerced into answering questions and directing the inspectors to the physical evidence. All of the hallmarks of coercion are present here. Armed inspectors stood over Mr. Capers and demanded answers to direct questions regarding the crime. Inspector Hoti carried under his arm the opened express mail envelopes, a trumpet-blast reminder that refusing to talk was futile as law enforcement already had gathered

evidence against its suspect.  Mr. Capers had heard the inspectors' instructions to one another to keep Mr. Lopez and him separate and not permit them to speak to each other.  Mr. Capers had just watched Mr. Lopez be taken away for a minute and then paraded past him; the only conclusion to be drawn was that Mr. Lopez had already spoken with inspectors and implicated Mr. Capers.  Mr. Capers had been patted down, frisked, and his hat taken from him.  He was handcuffed behind his back and at eye level with Inspector Hoti's firearm.  Two inspectors loomed over Mr. Capers alone in an enclosed room.

Nothing about Mr. Capers' reactions to the interrogations demonstrates that he was somehow hardened to these methods.  He was in a state of anxiety which attends situations of arrest.  He was uncounseled and received no *Miranda* warnings.  His will was overborne.  The statements were not the result of free and unconstrained choice.  Because the statements were involuntary, the physical evidence fruits of the interrogation must be suppressed.  *See New Jersey v. Portash*, 440 U.S. 450, 459 (1979).

*United States v. Patane*, 542 U.S. 630, 634 (2004), eliminated the exclusion of resulting physical evidence as a remedy for statements taken in violation of *Miranda* but otherwise voluntary.  The exclusionary rule retains all of its vitality for involuntary statements, however.  *Patane*, 542 U.S. at 640 ("[T]hose subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial.") (citations omitted).  As demonstrated above, the conduct described herein requires the suppression of the physical evidence fruits as well as the statements.

## IV.   AN EVIDENTIARY HEARING IS REQUIRED

Mr. Capers requests an evidentiary hearing on this motion.  A hearing is warranted to thoroughly explore the conditions of the four interrogations Mr. Capers endured, the involuntariness of his waiver of his Fifth Amendment rights, and the unduly coercive aspects of the interrogations that warrant suppression of the physical evidence seized pursuant to those interrogations.  The defense has submitted a sworn first-hand account in support of its suppression motion, and, in accordance with the standard for an evidentiary hearing, has submitted sufficient facts that, if credited, show that exclusion of the evidence is required.  *See United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969); *United States v. Ahmad*, 992 F. Supp. 682, 685 (S.D.N.Y. 1998).  Thus, Mr. Capers respectfully requests that, at a minimum, the Court hold a hearing on the motions.

## CONCLUSION

For the foregoing reasons, Mr. Capers respectfully requests that the Court grant an Order suppressing all statements made by Mr. Capers, the physical evidence fruits of those statements, and granting such other and further relief as the Court deems proper.

Dated: May 15, 2006
          New York, New York

MORVILLO, ABRAMOWITZ, GRAND,
IASON & SILBERBERG, P.C.

By: _____
       Jerrold L. Steigman (JS-9137)

Cyrus R. Vance, Jr. (CV-2770)
Jerrold L. Steigman (JS-9137)
Kathryn M. Spota (KS-8688)
Attorneys for Defendant William Capers
565 Fifth Avenue
New York, New York 10017
(212) 856-9600